## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 20 2019, 6:57 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Larry Corneal Johnson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 20, 2019

Court of Appeals Case No.
18A-CR-1735

Appeal from the Vanderburgh
Superior Court

The Honorable Robert J. Pigman,
Judge

Trial Court Cause No.
82D03-1705-F2-2989

**Bradford, Judge.**

# Case Summary

[1] Larry Johnson was charged with two counts of dealing in a narcotic drug, a Level 2 felony and a Level 5 felony, and maintaining a common nuisance, a Level 6 felony. After dismissing his private counsel and repeatedly asserting that he wished to proceed pro se, the trial court denied two of Johnson's requests for "co-counsel[,]" the first coming during a hearing on the morning of trial and the second following jury selection. Over Johnson's objection, the State admitted evidence that Johnson had sold a confidential informant heroin on approximately ten prior occasions. Johnson was found guilty as charged and received an aggregate twenty-five-year sentence.

[2] Johnson, by counsel, now appeals his conviction raising two issues for our review, which we expand and restate as: (I) whether the trial court violated Johnson's right to counsel when it allowed him to proceed pro se; (II) whether Johnson reasserted his right to counsel during trial and, if so, whether the trial court erred in denying Johnson's request; and, (III) whether the trial court committed fundamental error when it permitted the State to introduce evidence of Johnson's prior drug dealing. Concluding the trial court did not violate Johnson's right to counsel by allowing him to proceed pro se, Johnson did not reassert his right to counsel, and the trial court did not commit fundamental error by permitting the State to introduce evidence of Johnson's prior drug dealing, we affirm.

# Facts and Procedural History[1]

[3] In January 2017, L.M. and her boyfriend were arrested with a substantial amount of methamphetamine. L.M. became a confidential informant ("the C.I.") and reported that she had purchased heroin from Johnson on approximately ten prior occasions. The C.I. arranged to purchase heroin from Johnson through a recorded phone call on May 16, 2017. The C.I. was provided with two recording devices disguised as a key fob and a cellphone and supplied with buy money to purchase the heroin. The C.I. drove to Johnson's residence under the supervision of police. Once the C.I. entered the residence, Johnson gave her one gram of heroin packaged in aluminum foil in exchange for $225 of buy money. Following the exchange, Johnson made a sexual advance toward the C.I. which was partially captured on audio.

[4] Police continued observation of Johnson's residence. After Johnson left by vehicle, police detained several individuals who attempted to enter the residence and executed a search warrant. The search revealed almost eleven grams of heroin, three digital scales, and drug paraphernalia. Police arrested Johnson following a traffic stop and the buy money was located on Johnson's person.

---

[1] We heard oral argument at Manchester University in North Manchester, Indiana at on March 5, 2019. We thank Manchester University for their generous hospitality and commend counsel for their skilled and informative oral advocacy.

[5] On May 18, the State charged Johnson with two counts of dealing in a narcotic drug, a Level 2 felony and a Level 5 felony, and maintaining a common nuisance, a Level 6 felony. Johnson moved for a speedy trial at his initial hearing on May 22. Attorney Ivan Arnaez entered his appearance for Johnson on June 6 and filed motions to suppress and dismiss.

[6] Arnaez moved to withdraw his appearance on October 6. At an October 31 hearing on the motion, the trial court engaged in the following colloquy with Johnson:

> [The Court]: Well you have, you have three options. You can represent yourself, you can hire someone, another lawyer to represent you or you can take a public defender. If you want a lawyer, you can't afford one, the Court can appoint one for you but . . .
>
> [Johnson]: I did hire a lawyer.
>
> [The Court]: Do what?
>
> [Johnson]: I did hire a lawyer.
>
> [The Court]: Well but he just told me that you asked him to, you know, get off your case, to withdraw from your case.
>
> [Johnson]: But he just said he's not going to refund any of my money. He's paid in full. He's paid in full. So he was hired to go to a trial, a jury trial. He's not taking me to a jury trial but he still – that shouldn't let him out of the – not paying the court costs. He still should be obligated for that but if you don't see fit like that I'll set a fast and speedy trial. If I have a fast and speedy trial I'll proceed pro se.
>
> [The Court]: You're going to represent yourself?
>
> [Johnson]: Yes sir. I'll proceed pro se.

[The Court]: Okay.  Why do you want to represent yourself?  That's not a very good idea.

[Johnson]: Your Honor, I'm sure you are aware of the, the video recordings in this case.

[....]

[The Court]: All right.  I understand that.  Why do you want to represent yourself?  Why don't you want the public defender to represent you or . . .

[Johnson]: Because I paid for an attorney.  I already paid for an attorney but I'll represent, I'll represent myself.  I think I can represent myself better than this gentleman here.

[The Court]: Okay.

[Counsel]: You know I'm not going to let him bad mouth me like that Your Honor.  We've filed a Motion to Dismiss, Motion to Suppress.  If I'm out of the case, I'm out of the case but I'm not going to let him say that.

[Johnson]: Your Honor the man has not – I don't even know my cause number.

[The Court]: Well obviously he can't represent you.  We're past that point.

[Johnson]: He has not sent me a cause number.  He has not sent me a . . .

[The Court]:  (Interrupting) Have you ever represented yourself before in any kind of Court proceeding?

[Johnson]: Yes.  Yes sir, Your Honor, I have.

[The Court]: You did?

[Johnson]: Yes but the point with him being, Your Honor, he has not sent me a copy of a search warrant.  They searched my home at 3:50 – they entered my house

> at two o'clock. The search warrant is for 3:58. He won't even send me a copy of the search warrant.

[The Court]: Okay.

[Johnson]: I got charged with these crimes at 2:34.

[The Court]: I understand that you and [counsel] have had a falling out. I'm going to grant his request – your request, actually, that he withdraw. If you have a problem with the fee arrangements, you don't think you were treated fairly you have to pursue that on your own through other legal remedies. I can't do anything about that in this case. Now . . .

[Johnson]: (Interrupting) Is my fast and speedy trial still good?

[The Court]: It's set for November 16th. Do you want – you still want to represent yourself?

[Johnson]: Yes sir. Yes sir. I'll be representing myself. Thank you, sir. I won't take much of the Court's time.

Tr., Vol. 2 at 15-18.

[7] Johnson renewed his motions to suppress and dismiss and filed a motion to compel. The trial court held a hearing on Johnson's motions on November 13. There, Johnson claimed he was unaware of the hearing and had not subpoenaed any witnesses. The Court stated:

> You've, by moving for an early trial, the Court has to try this case on Thursday. Now you have not subpoenaed nor have you requested that the Court subpoena any witnesses. If you are telling the Court that you want subpoenas issued to witnesses, the Court can arrange that but you're asking the Court to do that and to deliver subpoenas and have individuals here and you're giving me – this is near the end of business on Monday so that gives the Court Tuesday and Wednesday to subpoena a list of witnesses.

*Id.* at 28. Over Johnson's objection, the trial court granted the State's motion for a continuance pursuant to Criminal Rule 4(D) for the State to obtain additional evidence from a witness who was in the hospital, explaining to Johnson "[n]ow it seems to me that you need that ninety days to get yourself prepared." *Id.* at 42.

[8] Johnson then filed a motion to dismiss or discharge on December 21. The trial court held a pretrial conference on January 16 and a hearing on Johnson's motions to suppress and dismiss on January 26. At the beginning of the hearing, the trial court asked Johnson again if he wanted counsel:

> [The Court]: We're here this morning in the matter entitled State of Indiana vs Larry Corneal Johnson. Mr. Johnson is present, he's in custody and he's representing himself so he is pro se. Now you still wish to represent yourself, Mr. Johnson?
>
> [Johnson]: Yes sir.
>
> [The Court]: Okay. You understand you're facing a Level 2 Felony here, it's pretty serious. You don't want legal counsel?
>
> [Johnson]: Yes sir. No sir.

*Id.* at 51. During the ensuing suppression hearing, both Johnson and the State presented evidence and cross-examined witnesses. The hearing was continued until January 30. Following an additional officer's testimony on that date, the trial court denied Johnson's motion to suppress.

[9] Also on January 30, the State filed a notice of Evidence Rule 404(b) evidence. The State indicated that "[Johnson] may introduce evidence [the C.I.] was at

his home prior to May 16, 2017 and [the C.I.] was in possession of heroin and planted the heroin in the home." Appellant's Appendix, Volume II at 88. Therefore, the State claimed that such evidence would "open the door for the State to introduce evidence [the C.I.] had purchased heroin from [Johnson] previously at his home and that he was her supplier as opposed to her obtaining heroin and planting it in his home." *Id*.

[10] The trial court held a hearing prior to trial on the morning of February 1. When Johnson asked about suppressing evidence, the trial court explained:

> [The Court]: I told you when you're going to represent yourself I cannot help you.
>
> [Johnson]: I agree with you, Your Honor.
>
> [The Court]: I cannot stand on your side of this case. You're responsible. You took responsibility for this. That's why I told you to hire—get a—let the Public Defender represent you.

Tr., Vol. 2 at 145. The State then asked about its notice of Rule 404(B) evidence to which the trial court responded, "If [Johnson] alleges the entrapment or if he says that – if [the State] [has] evidence that that's not true, the evidence is not true, certainly." *Id*. at 149.

[11] The trial court conducted a hearing on Johnson's motion to dismiss, which it denied from the bench after hearing Johnson's evidence. Johnson then requested Judge Robert J. Pigman recuse himself because he was the prosecuting attorney in a case against Johnson that reached the Indiana

Supreme Court in 1987.[2] Judge Pigman declined to recuse himself but offered Johnson more time to "find some authority to support [his] position in this case[.]" *Id.* at 171. Johnson declined.

[12] After a lengthy discussion regarding whether the C.I. had any prior convictions, Johnson asked:

> [Johnson]: Can I have Co-Counsel get me various papers?
>
> [The Court]: Get you what?
>
> [Johnson]: Can I have Co-Counselor to assist me, Co-Counselor . . .
>
> [The State]: Judge that's a . . .
>
> [Johnson]: Well he has two people. You have two people over there.
>
> [The State]: That is a late request the morning of trial. He has been insistent, pro se . . .
>
> [The Court]: (Interrupting) I offered you that once before, Mr. Johnson and you didn't want that.
>
> [Johnson]: No. You offered me an attorney.
>
> [The Court]: And I offered you standby counsel and you said you didn't need a lawyer.
>
> [The State]: May I bring to this Court's attention, Ms. Inkenbrandt was here when we did our pre-trial. He and I had a dialog then. I can't remember which deputy was here. It may have been Lieutenant Ashworth and I admonished Mr. Johnson then, I said sir you do not know what you're doing in this case. You need to be

---

[2] *See Johnson v. State*, 507 N.E.2d 980 (Ind. 1987).

represented by an attorney. He rebuked my statement and said I don't need any counsel, I don't need a Public Defender. I'm ready to go.

[The Court]: Yeah (affirmative). I understand. You can't have a trial today with co-counsel.

[Johnson]: Your Honor. Okay. Your Honor this is the charging Information.

[The Court]: Right.

[Johnson]: This is upstairs. This is not even in this courtroom.

[The Court]: Mr. Johnson it's obvious to me that I was right months ago when I told you you're making a big mistake.

[Johnson]: (Interrupting) But I'm saying this charging Information is upstairs.

[The Court]: Many of the things you've said and many of the efforts you've made on your behalf have not been successful because many of them, you just don't know what you're doing. You're not adequately skilled in the law how to investigate these things, how these things work and that's what I told you. A lawyer can do things for you that you can't do for yourself. You're right. You're in jail. You have very limited access to anything. That's why I . . .

[Johnson]: (Interrupting) But I still should be, I still should be . . .

[The Court]: (Continuing) . . . on a number of occasions asked you to . . .

[Johnson]: (Interrupting) I still should be entitled to a fair trial Your Honor.

[The Court]: Yeah (affirmative), you are.

[Johnson]: Irregardless [sic] of that. I . . .

[The Court]: (Interrupting) But you're the one who is interfering with that, not me. I can't – by law I am not allowed to be on your side.

[Johnson]: He was supposed to furnish me the text cell phones months ago.

[The Court]: Well they just – they don't have them and there was a record made months ago about that issue and the Court ruled on that.

[Johnson]: But this guy here got up – Hassler just got up on the stand and told you he done destroyed material evidence. He destroyed it.

[The Court]: Do you, do you want a lawyer to help you on this case or not? You can't have a trial today if that's what you want.

[Johnson]: Okay but you going to make a ruling upon him destroying material evidence? He done destroyed the evidence.

[The Court]: No. I am not going to make a ruling that Detective Hassler destroyed material evidence.

[Johnson]: Okay. Come on. We gonna go to trial then. Come on. Go to trial. Let's go.

[The Court]: All right.

*Id.* at 176-78.

[13] Following jury selection, the trial court inquired:

[The Court]: State are you ready?

[The State]: Yes.

[The Court]: Mr. Johnson?

[Johnson]: No. Your Honor can I have a co-counsel?

[The Court]: Sir you can't – you can't wait till the day of the trial to ask for that. There's nobody in the Public

Defender's Office who would be available. I did sort of check this morning. There's nobody available and you know, nobody would feel competent to step in in the middle of a trial and take over or help out. They wouldn't have any idea what the case is about or what you're trying to do.

[Johnson]: Well they could help me with – in objecting to certain evidence that Prosecutor may offer that's, you know – before you kind of told me I could listen to my cell phone tapes and now they telling me – or listen to the C.I.'s cell phone tape, now they telling me that's not available so I was kind of lead (sic) up into this, misled from the other room to come here, I was kind of a little misled with that one. I didn't see that one coming.

[….]

[The Court]: Okay. Well as to your request for standby counsel it's too late. I mean there's no way I can get somebody here now to do that.

Tr., Vol. 3 at 33-36.

[14] The trial court proceeded to the State's case-in-chief. During Johnson's cross-examination of Detective Hassler, who arranged for the controlled buy with the C.I., Johnson asked:

[Johnson]: Okay. Between January and May the 16th, 2017 what controlled buys did [the C.I.] do other than mine?

[Hassler]: None.

[Johnson]: None? Okay. So what make you rely on [the C.I.] to send her to somebody's home?

[Hassler]: Well as I previously stated I determined that she was reliable and credible based on not only the

> things she said to me before during conversations that I had with her but also after the buy, examining the video and seeing that yes, that's corroborated.

[Johnson]: Okay. Excuse me sir. I'm not talking about after the buy. I'm talking about before you sent her into the home, what calibration did you have – the phone conversation didn't speak about her (inaudible). She just said she's coming over.

[Hasler]: I understand your question.

[The State]: Judge may we approach to that question?

[Johnson]: It's a yes or no question.

[The State]: I know it is but I want to approach.

[The Court]: Okay. Yes you may. Come up here Mr. Johnson.

(At sidebar.)

[The State]: Consistent with the Rules of Evidence, Your Honor, I instructed Mr. Hassler not to volunteer any information about the C.I. telling him she previously purchased heroin while he was on the stand unless [Johnson] opened the door. Mr. Hassler, I do believe, is going to answer Mr. Johnson's question when he asks for corroboration, Mr. Hassler is going to say he was aware that she had been buying heroin from him prior to this date.

[Johnson]: That's not true.

[The State]: I get it's not true but if you think that's what he's asking that is what Mr. Hassler is going to say when he's asking for corroboration.

[The Court]: Yeah (affirmative). If you're asking for corroboration . . .

[The State]: (Interrupting) That is going to be the answer.

[The Court]: Do you want to withdraw the question or you can go forward. It's up to you.

> [Johnson]: Okay. All right.
>
> (Sidebar concludes.)
>
> [Johnson]: Other than the C.I., did you have any other information that drugs was being sold, that I was selling somebody heroin?

*Id.* at 76-78. Over objection, Detective Hassler explained that "we had been tipped off that [Johnson] had been selling heroin from his address from a We Tip [hotline tip]." *Id*. at 79.

[15] Johnson eventually inquired into the C.I.'s pending charge, asking Detective Hassler:

> [Johnson]: Did you think [the C.I.] had an incentive then to entrap people?
>
> [Hassler]: I don't view it as entrapping.
>
> [Johnson]: Did you put her in jail?
>
> [Hassler]: I don't know if I did or didn't on that case. I can't recall.
>
> [Johnson]: Did she stay out of jail to entrap people? Is this true?
>
> [Hassler]: I never entrapped anybody.
>
> [Johnson]: I didn't say you. I didn't say you. You're a fine Officer. I'm saying sometimes – have you been tricked by any of these C.I.'s you've been working with? You said that you've been named T and this stuff. Have you ever been tricked by a C.I.?
>
> [Hassler]: Yes . . .
>
> [….]
>
> [Johnson]: Is she from Gibson County?
>
> [Hassler]: I don't know.

[Johnson]: You don't know. Okay. Then you just send – you would just send any person in somebody's home and just don't know nothing about them?

[Hassler]: Well I think I very clearly explained the process that I go through and the decision that I make of how we select those people and I don't just send anybody in any random person's home. She obviously knew you somehow and she knew that she could purchase heroin from you so naturally I sent her into your house and that's exactly what happened.

[Johnson]: Did you ever think maybe that she maybe knew that she could trick me?

[Hassler]: Well to be honest that's not my decision to make whether you feel like you've been tricked or not. The end all be all result was that you're deciding at the end of the day to sell heroin and that's what you did to my C.I. therefore I don't know what to tell you. Don't break the law I guess.

[Johnson]: But your C.I. is breaking the law?

[Hassler]: Okay.

[Johnson]: I mean your C.I. broke the law driving there, speeding there. She's breaking the law, bringing drugs into my home. She's breaking the law having sexual intercourses without my consent, (inaudible) me. Did I agree to be in a pornography movie?

*Id*. at 97-99.

[16] During redirect examination of Detective Hassler, the State asked to approach the bench:

[The State]: [Johnson] stated on cross Judge, the C.I. brought drugs into my home, (inaudible) entrapment, the C.I. busted for dealing. I think that opens the door to get into the fact that she did not bring drugs into

> his home and I can get it in with Hassler the fact
> that [the C.I.] has [bought] drugs from him before.
>
> [Johnson]: No she hasn't.
>
> [The State]: He made that statement very clearly.
>
> [The Court]: I think you got to ask her.

*Id*. at 105.

[17] Sometime later, the State asked the C.I. on direct examination:

> [The State]: Prior to May 16th, 2017 had you purchased heroin
> from [Johnson]?
>
> [The C.I.]: Yes.
>
> [The State]: How many times?
>
> [The C.I.]: Probably about ten times.
>
> [The State]: Was he your heroin supplier?
>
> [The C.I.]: Yes.
>
> [The State]: Where on those prior ten times, where did that
> purchase take place?
>
> [The C.I.]: Most of the time at his house and once or twice at
> his – where he worked at.

*Id*. at 128. Johnson objected because "there's no evidence whatsoever that she

purchased heroin from me period." *Id*. at 129.

[18] Later, on cross-examination, Johnson asked Detective Simpson:

> [Johnson]: Have any of your sources from other cities or any of
> your C.I.'s that you know of told you that they sold
> some heroin to Larry Johnson at 704 Washington?
>
> [Simpson]: They've never – I've never had a confidential source
> say anything about them directly selling heroin to
> you. We've had – I've had confidential sources tell

me that you are dealing heroin from your house on
Washington but I never had any confidential
sources tell me that you – that they actually sold
you heroin.

[Johnson]:    Okay.  And I assume, I'm asking you, are you
referring to, to [the C.I.]?

[Simpson]:    No.  I'm talking about other confidential
informants.

[Johnson]:    Are you referring to We Tip?

[Simpson]:    No, I'm not referring to a We Tip.  I'm referring to
other confidential informants that provide
information to me talked about you selling heroin
from your address on Washington.

Tr., Vol. 4 at 17-18.

[19]    At the conclusion of the two-day trial on February 2, 2018, the jury found
Johnson guilty as charged.  On April 3, newly-appeared defense counsel filed a
motion to set aside conviction and set a new trial.  At a sentencing hearing on
June 13, the trial court denied Johnson's motion and sentenced Johnson to
twenty-five years for dealing a narcotic drug, a Level 2 felony; five years for
dealing in a narcotic drug, a Level 5 felony; and two years for maintaining a
common nuisance, a Level 6 felony.  The trial court ordered all the sentences to
run concurrently for an aggregate sentence of twenty-five years.

# Discussion and Decision

## I.  Whether Johnson Waived The Right to Counsel

[20]    Johnson argues the trial court denied him his right to counsel when he was
permitted to proceed pro se.  Johnson advances his argument under the Sixth

Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution, both of which protect a defendant's right to be represented by counsel. *Kowalskey v. State*, 42 N.E.3d 97, 102 (Ind. Ct. App. 2015). Although a defendant has a right to counsel, when a defendant "insists that he wants to conduct his own defense[,]" the Sixth Amendment "does not force a lawyer upon him." *Faretta v. California*, 422 U.S. 806, 807 (1975). A defendant, however, "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id*. (quotation omitted). When a defendant waives the right to counsel and elects to proceed pro se, we must decide whether the trial court properly determined that the defendant's waiver was knowing, intelligent, and voluntary. *Jones v. State*, 783 N.E.2d 1131, 1138 (Ind. 2003). We review a trial court's conclusion that a defendant knowingly and voluntarily waived his right to counsel de novo. *Miller v. State*, 789 N.E.2d 32, 37 (Ind. Ct. App. 2003).

[21] In *Poynter v. State*, our supreme court adopted a four factor test for whether a waiver is knowing and intelligent:

> (1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed pro se.

749 N.E.2d 1122, 1127-28 (Ind. 2001). In making this analysis, our supreme court also noted that the trial court:

is in the best position to assess whether a defendant has knowingly and intelligently waived counsel, and we will most likely uphold the trial judge's decision to honor or deny the defendant's request to represent himself where the judge has made the proper inquiries and conveyed the proper information, and reaches a reasoned conclusion about the defendant's understanding of his rights and voluntariness of his decision.

*Id.* at 1128.

[22] Furthermore, this court has set forth several guidelines for how a trial court should advise a defendant when he considers self-representation. They are:

(1) The defendant should know the nature of the charges against him, the possibility that there may be lesser included offenses, and the possibility of the defenses and mitigating circumstances; (2) the defendant should be aware that self representation is almost always unwise, that he may conduct a defense which is to his own detriment, that he will receive no special indulgence from the court and will have to abide by the same standards as an attorney, and that the State will be represented by experienced professional legal counsel; (3) the defendant should be instructed that an attorney has skills and expertise in preparing for and presenting a proper defense; and (4) the trial court should inquire into the defendant's educational background, familiarity with legal procedures and rules of evidence and mental capacity.

*Dowell v. State*, 557 N.E.2d 1063, 1066-68 (Ind. Ct. App. 1990), *trans. denied*. Our supreme court has endorsed these guidelines but stated they do not "constitute a rigid mandate setting forth specific inquiries that a trial court is required to make before determining whether a defendant's waiver of the right to counsel is knowing, intelligent, and voluntary." *Leonard v. State*, 579 N.E.2d 1294, 1296 (Ind. 1991). Indeed, "[t]here are no magic words a judge must utter to ensure a defendant adequately appreciates the nature of the situation."

*Kubsch v. State*, 866 N.E.2d 726, 736 (Ind. 2007). The court "need only come to a considered determination that the defendant is making a voluntary, knowing, and intelligent waiver." *Poynter*, 749 N.E.2d at 1126. With this standard in mind, we now turn to consideration of the *Poynter* factors.

[23] Through focusing on the extent of the trial court's inquiry and other evidence in the record, the first two *Poynter* factors consider whether the defendant had sufficient information about the dangers and disadvantages of self-representation. Here, we conclude these factors weigh in favor of a conclusion that Johnson made a voluntary, knowing, and intelligent waiver.

[24] The trial court provided Johnson with several warnings regarding dangers and disadvantages of self-representation. Immediately after Johnson indicated he wished to proceed pro se, the trial court stated, "That's not a very good idea." Tr., Vol. 2 at 16. A week before trial, the court stated, "you're facing a Level 2 Felony here, it's pretty serious." *Id.* at 51. On the day of trial, the court warned, "I cannot stand on your side of this case. You're responsible. You took responsibility for this. That's why I told you to hire – get a – let a Public Defender represent you." *Id*. at 145. When Johnson asked about the C.I.'s prior convictions, the trial court stated, "that's why you needed a lawyer, to help to check on that stuff." *Id*. at 148. The trial court also explained:

> [The Court]: Mr. Johnson it's obvious to me that I was right months ago when I told you you're making a big mistake.
>
> [Johnson]: (Interrupting) But I'm saying this charging information is upstairs.

[The Court]: Many of the things you've said and many of the efforts you've made on your behalf have not been successful because many of them, you just don't know what you're doing. You're not adequately skilled in the law how to investigate these things, how these things work and that's what I told you. A lawyer can do things for you that you can't do for yourself. You're right. You're in jail. You have very limited access to anything. That's why I . . .

[Johnson]: (Interrupting) But I still should be, I still should be . . .

[The Court]: (Continuing) . . . on a number of occasions asked you to . . .

[Johnson]: (Interrupting) I still should be entitled to a fair trial Your Honor.

[The Court]: Yeah (affirmative), you are.

[Johnson]: Irregardless [sic] of that. I . . .

[The Court]: (Interrupting) But you're the one who is interfering with that, not me. I can't – by law I am not allowed to be on your side.

[….]

[The Court]: Do you, do you want a lawyer to help you on this case or not? You can't have a trial today if that's what you want.

*Id.* at 177-78. And, even the prosecutor warned Johnson:

I said sir you do not know what you're doing in this case. You need to be represented by an attorney. [Johnson] rebuked my statement and said I don't need any counsel, I don't need a Public Defender. I'm ready to go.

*Id.* at 176-77.

[25] On these first two *Poynter* factors, we view the facts similar to those of *Ellerman v. State*, 786 N.E.2d 788, 794 (Ind. Ct. App. 2003). Holding the defendant knowingly and voluntarily waived his right to counsel, the *Ellerman* court emphasized that the trial court had warned the defendant that the attorneys for the State were highly trained and knew the rules of evidence, the prosecutor had warned the defendant that he would not be given any special treatment simply because he was representing himself, and the prosecutor warned the defendant that his decision to represent himself was "one of the stupidest things [he had] ever encountered." *Id.* Similarly here, the trial court repeatedly warned Johnson that representing himself was ill-advised, that a lawyer has special skills that he did not possess, that he would not be given any special treatment, that the court could not help him or act on his behalf, and even the prosecutor warned Johnson that he did not know what he was doing and that he needed to be represented by an attorney. Therefore, as in *Ellerman*, we conclude the first two *Poynter* factors weigh in favor of findings that Johnson made a knowing, intelligent, and voluntary waiver of his right to counsel.

[26] The third *Poynter* factor concerns whether the defendant has the background and experience necessary to make a voluntary, knowing, and intelligent waiver of his right to counsel. Johnson's pre-sentence report indicates that he has five previous felony convictions and numerous misdemeanor convictions. *See* Appellant's Appendix, Vol. II at 159. Johnson was therefore an experienced criminal litigant who was more likely to understand the dangers of self-representation. *See Taylor v. State*, 944 N.E.2d 84, 91 (Ind. Ct. App. 2011) (in

holding defendant's waiver of counsel was knowing, intelligent, and voluntary, the court considered the defendant's five prior felony convictions and noted the defendant "was no stranger to the criminal justice system."). Perhaps recognizing that fact on appeal, Johnson argues the trial court failed to sufficiently inquire into his background while highlighting his "nearly nonsensical" trial strategy. Br. of Appellant at 21.

[27] Although the record is absent of an extensive inquiry into Johnson's background, the trial court did inquire as to whether Johnson had ever represented himself, to which Johnson responded in the affirmative, and the trial court was aware of at least one of Johnson's prior felony convictions. Johnson's pre-sentence report indicates that he obtained a GED and attended some post-secondary education at Ball State University and IVY Tech. *See* Appellant's App., Vol. II at 158.

[28] Additionally, Johnson's competence was never at issue. The record reflects that Johnson was alert, engaged, coherent, and capable of understanding the proceedings and their import. At times, Johnson even displayed a sophisticated understanding of the charges and sentence that he faced. For example, during a discussion regarding a plea agreement that he had proposed to the State, Johnson explained:

> [Johnson]:    Your Honor with all due respect Your Honor you asking me – he's asking me, talking about a Level 2 [felony]. That's no Level 2 there. It's a [sic] inflated charge and I'm offering to plead, I'm offering that I would plea out, I would even give them all three convictions if they want all three

convictions and maybe that would give [the C.I.] credibility, okay because if you risk going into trial and if you lose, then you're going to lose her credibility. Now I gave you the sale, I gave you the possession, okay, but you . . .

[....]

But what I'm saying, Your Honor, okay. He dropped the Level 2 down to a – you drop the Level 2 down to a Level 5. He can put a year on the Level 5 and then give me eighteen months on the other two, the two 6's and run them together and I think that, I think that's, under the circumstances, that's a fair deal.

Tr., Vol. 2 at 173-74.

[29] Despite these facts, Johnson argues that because his trial strategy was "incomprehensible," and his objections were "meaningless[,]" the trial court should have known that Johnson lacked the requisite legal knowledge or expertise to handle a major felony trial on his own. Br. of Appellant at 22. The trial court noted Johnson's inadequate preparation and knowledge on the morning of trial, warning Johnson, "it's obvious to me that I was right months ago when I told you you're making a big mistake." Tr., Vol. 2 at 177. The trial court then *again* offered Johnson the assistance of counsel and Johnson *again* insisted on proceeding pro se. The Sixth Amendment "does not force a lawyer upon [a defendant]." *Faretta*, 422 U.S. at 807. And, as the Supreme Court has noted, a defendant's "technical legal knowledge [is] not relevant to an assessment of his knowing exercise of the right to defendant himself." *Id*. at 836.

[30] Finally, we consider the context of Johnson's decision. Johnson was insistent on a speedy trial date and that he could do a better job of representing himself than his hired counsel. We therefore view Johnson's decision as strategic and note that defendants who waive their right to counsel for strategic reasons tend to do so knowingly. *See Kubsch,* 866 N.E.2d at 738.

[31] Although a better approach would have been to thoroughly and succinctly advise Johnson on the dangers and disadvantages to self-representation,[3] given the numerous warnings scattered about the landscape of this case and Johnson's extensive criminal history, we conclude Johnson voluntarily, knowingly, and intelligently waived his right to counsel. The trial court offered Johnson counsel as late as the morning of trial and he was insistent on proceeding pro se. However ill-advised, this was Johnson's right and we cannot now say he was unaware of the dangers and disadvantages of self-representation.

## II. Whether Johnson Reasserted the Right to Counsel

[32] Next, Johnson argues the trial court erred in denying Johnson "the opportunity to reassert his right to counsel." Br. of Appellant at 24. It is within the trial court's discretion to determine whether a defendant may abandon his pro se defense after the trial has begun and reassert his right to counsel. *Koehler v.*

---

[3] And we take this opportunity to so remind trial courts.

*State*, 499 N.E.2d 196, 198-99 (Ind. 1986). We will reverse only if we conclude that the trial court abused its discretion. *Id*.

[33] Following jury selection, the trial court inquired:

> [The Court]: State are you ready?
>
> [The State]: Yes.
>
> [The Court]: Mr. Johnson?
>
> [Johnson]: No. Your Honor can I have a co-counsel?
>
> [The Court]: Sir you can't – you can't wait till the day of the trial to ask for that. There's nobody in the Public Defender's Office who would be available. I did sort of check this morning. There's nobody available and you know, nobody would feel competent to step in in the middle of a trial and take over or help out. They wouldn't have any idea what the case is about or what you're trying to do.
>
> [Johnson]: Well they could help me with – in objecting to certain evidence that Prosecutor may offer that's, you know – before you kind of told me I could listen to my cell phone tapes and now they telling me – or listen to the C.I.'s cell phone tape, now they telling me that's not available so I was kind of lead (sic) up into this, misled from the other room to come here, I was kind of a little misled with that one. I didn't see that one coming.
>
> [….]
>
> [The Court]: Okay. Well as to your request for standby counsel it's too late. I mean there's no way I can get somebody here now to do that.

Tr., Vol. 3 at 33-36.

On appeal, Johnson characterizes his request as "reassert[ing] his right to counsel[,]" Br. of Appellant at 24, and argues that the trial erred by failing to consider the *Koehler* factors[4] before denying his request. However, given Johnson's previous request on the morning of trial[5] and his explanation of the need for co-counsel to assist him in self-representation, we view Johnson's request as one for hybrid representation.

In *Sherwood v. State*, our supreme court explained:

> This Court has previously stated that the recommended protection for a pro se defendant is standby counsel. *German v. State*, 268 Ind. 67, 73, 373 N.E.2d 880, 883 (1978). On the other hand, appointment of standby counsel is discretionary; a defendant who proceeds pro se has no right to demand the appointment of standby counsel for his assistance. *Kindred v. State*, 521 N.E.2d 320, 323 (Ind. 1988). The trial court may have the discretion to direct standby counsel to take over at any point during the proceedings if the defendant's conduct becomes inappropriate, *German*, 373 N.E.2d at 883[.]

---

[4]  In *Koehler*, our supreme court outlined the following factors for a trial court to consider when ruling on a defendant's request to change from self-representation to counsel-representation:

> (1) defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation; (2) the reasons set forth for the request; (3) the length and stage of the trial proceedings; (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion; and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney.

499 N.E.2d at 199.

[5]  The morning of trial, Johnson asked if he could have "Co-Counsel get [him] various papers[.]" Tr., Vol. 2 at 176. When the trial court explained to Johnson that he had previously declined standby counsel, Johnson replied, "No. You offered me an attorney." *Id.*

717 N.E.2d 131, 135 n.2 (Ind. 1999).  Notably here, the trial court checked with the public defender's office but there were no public defenders available.  *See* Tr., Vol. 3 at 33.

[36]     Our supreme court addressed a similar situation in *Henley v. State*, 881 N.E.2d 639 (Ind. 2008).  During the second day of trial where a pro se defendant was appointed standby counsel, the defendant requested of the court:

> "I'd like [standby counsel] to cross examine the witnesses for me."  The court inquired, "You would like for him to take over your case?"  [The defendant] responded, "Not take over it, but to co-counsel with me."  After the trial court explained that hybrid representation was not permitted, [the defendant] responded, "I still want to remain in charge of the case."  The trial court then denied [the defendant's] request.

*Id.* at 647 (citations omitted).  In the context of an ineffective assistance of appellate counsel claim, our supreme court stated, "The law is settled that '[t]he Sixth Amendment does not require a trial judge to permit hybrid representation[.]'"  *Id*. (quoting *Sherwood*, 717 N.E.2d at 135).  Therefore, the court concluded "[b]ecause hybrid representation was not allowed, there would have been no need for the trial court to consider the *Koehler* factors in denying [the defendant's] request."  *Id.* at 648.  As in *Henley*, we view Johnson's request as one for hybrid representation and there was no need for the trial court to consider the *Koehler* factors in denying his request.

# III. Admission of Evidence

[37] Finally, Johnson argues the "trial court committed fundamental error when it permitted the State to introduce irrelevant, highly prejudicial character and misconduct evidence." Br. of Appellant at 30. Our standard of review for rulings on the admissibility of evidence is well settled. The admission or exclusion of evidence rests within the trial court's sound discretion, and its decision is reviewed for an abuse of that discretion. *McClendon v. State*, 910 N.E.2d 826, 832 (Ind. Ct. App. 2009), *trans. denied*. To preserve an issue for appeal, the defendant must contemporaneously object at trial. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). Because Johnson failed to contemporaneously object at trial for the reasons he now argues on appeal, Johnson must establish the trial court committed fundamental error. *See Delarsoa v. State*, 938 N.E.2d 690, 694 (Ind. 2010). The fundamental error exception is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Matthews v. State*, 849 N.E.2d 578, 587 (Ind. 2006). Indiana Evidence Rule 401 explains that evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Rule 402 further provides that "[i]rrelevant evidence is not admissible."

[38] Johnson first argues that whether he sold heroin to the C.I. or other buyers did not make the elements of the crime more or less probable and the evidence was

therefore irrelevant, inadmissible evidence. The record reveals that prior to the evidence's admission, Johnson asked Detective Hassler several questions aimed at raising the defense of entrapment.[6] To rebut an entrapment defense, the State must show "either (1) there was no police inducement, or (2) the defendant was predisposed to commit the crime." *Griesemer v. State*, 26 N.E.3d 606, 609 (Ind. 2015). As the evidence tended to prove there was no police inducement and/or the defendant was predisposed to commit the crime, we conclude the evidence was relevant to show that the police did not entrap Johnson.

[39] Rule 404(b)(1) provides that, in general, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, the "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R. 404(b)(2). In order for this otherwise inadmissible evidence to become admissible, the defendant must first "'open the door' to questioning on that evidence." *Jackson v. State*, 728 N.E.2d 147, 152 (Ind. 2000). To "open the door," a defendant "must leave the trier of fact with a false or misleading impression of the facts related." *Gilliam v. State*, 270 Ind. 71, 383 N.E.2d 297, 301 (1978). In assessing the admissibility of evidence under Indiana Evidence Rule 404(b), the trial court must (1)

---

[6] Johnson asked Detective Hassler, "did you think [the C.I.] had an incentive then to entrap people?" and, "[d]id the C.I. stay out of jail to entrap people? Is this true?" Tr., Vol. 3 at 97.

determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Hicks v. State,* 690 N.E.2d 215, 221 (Ind. 1997).

[40] Johnson argues the evidence of his prior drug deals with the C.I. "was flatly and plainly inadmissible under [Indiana Evidence Rule] 404(b)." Br. of Appellant at 35. In support thereof, Johnson relies on *Swain v. State*, 647 N.E.2d 23 (Ind. Ct. App. 1995), and *Haynes v. State*, 578 N.E.2d 369 (Ind. Ct. App. 1991), both of which reversed a trial court's decision to admit evidence of the defendant's prior drug dealing. These cases are distinguishable by the fact that neither defendant presented an entrapment defense, as Johnson did here. In *Stoker v. State*, a panel of this court held an entrapment defense "affirmatively presented a claim of contrary intent, thereby triggering the exception to [Rule] 404(b)." 692 N.E.2d 1386, 1391 (Ind. Ct. App. 1998). Therefore, the trial court did not err in allowing testimony concerning the defendant's prior drug sales. *Id.* Similarly, in *Dixon v. State*, a panel of this court held that the defendant's entrapment defense rendered testimony of prior drug transactions "relevant to proving [the defendant's] knowledge and intent to deal in cocaine." 712 N.E.2d 1086, 1089 (Ind. Ct. App. 1999). In light of *Stoker* and *Dixon*, Johnson's entrapment defense placed his intent at issue and the State was therefore permitted to present the evidence in order to rebut that defense.

[41] Even if evidence of a prior bad act is admissible, however, its probative value must still be weighed against the unfair prejudice that its admission may cause

to a defendant. Evid. R. 403; *Jones v. State*, 708 N.E.2d 37, 40 (Ind. Ct. App. 1999), *trans. denied*. Given Johnson's entrapment defense and the State's burden to rebut it, we conclude the probative value of Johnson's history of drug dealing outweighed the danger of unfair prejudice. Accordingly, Johnson has failed to show the trial court committed error, let alone fundamental error.

# Conclusion

[42] For the reasons set forth above, we conclude the trial court did not violate Johnson's right to counsel by allowing him to proceed pro se, Johnson did not reassert his right to counsel, and the trial court did not commit fundamental error by permitting the State to introduce evidence of Johnson's prior drug dealing. We therefore affirm in all respects.

[43] Affirmed.

Mathias, J., and Altice, J., concur.